UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBERT STEPHEN SENTILLES | CIVIL ACTION |
| VERSUS | NO. 21-958 |
| HUNTINGTON INGALLS INCORPORATED, *et al.* | SECTION M (3) |

## ORDER & REASONS

Before the Court are cross-motions for summary judgment filed by crossclaim plaintiff Pelnor, L.L.C. f/k/a Pellerin Milnor Corporation ("Pelnor") and crossclaim defendant First State Insurance Company ("First State"),[1] to which each party responds in opposition[2] and then replies in further support of its motion.[3] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons granting Pelnor's motion and denying First State's motion because, by the terms of the applicable insurance policy, First State owes Pelnor indemnity for all of Pelnor's reasonable attorney's fees related to Pelnor's defense of plaintiff's claims.

**I.     BACKGROUND**

This case involves claims for injuries caused by asbestos exposure. On October 27, 2020, plaintiff Robert Stephen Sentilles was diagnosed with mesothelioma.[4] On May 14, 2021, Sentilles filed this suit in state court asserting negligence and strict liability claims against several defendants, including Pelnor, and alleging that his disease was caused by exposure to asbestos that

---

[1] R. Docs. 327; 330.
[2] R. Docs. 374; 375.
[3] R. Docs. 392; 393.
[4] R. Doc. 1-1 at 2.

occurred from the 1950s through the 1980s and after.[5]  As to Pelnor, Sentilles alleged in the original complaint that he was exposed to asbestos when he worked at Pelnor from 1974 through 1983.[6]  On May 18, 2021, defendant Huntington Ingalls Incorporated ("Avondale") removed the case to this Court.[7]  Later, on March 25, 2024, Sentilles filed an amended complaint, alleging, for the first time, occupational exposure to asbestos at Pelnor for a shorter period, from 1974 through 1976 (rather than from 1974 through 1983).[8]

In the 1970s, First State issued an umbrella insurance policy to Pelnor's predecessor-in-interest, Pellerin Milnor Corporation, for the policy period May 31, 1973, to May 31, 1976.[9]  Pelnor currently holds the rights to that policy.[10]  The policy limit is $5,000,000 in excess of the amount recoverable under the underlying insurance or Pelnor's $10,000 retained limit for "[u]ltimate net loss as the result of any one occurrence not covered by said underlying insurance," and there is no underlying insurance.[11]  The relevant insuring agreements of the policy state:

1. <u>Coverage</u>

    The Company [*i.e.*, First State] agrees to indemnify the insured for ultimate net loss in excess of the retained limit hereinafter stated, subject to the limitations, conditions and other terms of this policy, which the insured may sustain by reason of the liability imposed upon the insured by law, or assumed by the Insured under contract on account of:

    (a) Personal Injury Liability

        For damages and expenses including damages for care and loss of services, to which this insurance applies, because of personal injury, including death

---

[5] *Id.* at 1-16.  Plaintiff later amended his complaint to drop any claims for the period after 1983. R. Doc. 56 at 6.
[6] R. Doc. 1-1 at 4.  This allegation remained the same in two subsequent amended complaints.  *See* R. Docs. 44 at 2; 56 at 6.
[7] R. Doc. 1.
[8] R. Doc. 289 at 6.
[9] R. Docs. 327-4; 330-3 at 1.
[10] R. Doc. 330-3 at 1.
[11] R. Docs. 327-4 at 1; 330-3 at 1.

> resulting therefrom, which occurs during the policy period, sustained by any person or persons, caused by any occurrence[.][12]

The language of the "personal injury liability" clause was amended by endorsement to add the language "which occurs during the policy period."[13]

> The policy defines "ultimate net loss" as follows:
>
> "Ultimate Net Loss" means the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the Insured is liable either by adjudication or compromise with the written consent of the Company, including after making proper deduction for all recoveries and salvages collectible, all loss expenses and legal expenses (including attorneys' fees, court costs and interests on any judgment or award)[14] but excludes all salaries of employees and office expenses of the Insured, the Company or any underlying insurer so insured.[15]

And the term "occurrence," as used in the "personal injury liability" provision, is defined as:

> an accident or event including continuous or repeated exposure to conditions which results, ~~during the policy period~~, in personal injury or property damage neither expected nor intended from the standpoint of the Insured.  For the purpose of determining the limit of the Company's liability, all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.[16]

The definition of "occurrence" was amended by endorsement to remove the phrase "during the policy period," as indicated by the strike through above.[17]

> The policy also includes an "assistance and cooperation" clause, which states in pertinent part:
>
> … the Company shall not be called upon to assume charge of the settlement or defense of any claim made or proceedings instituted against the Insured; but the

---

[12] R. Doc. 327-4 at 10, 13.
[13] *Id.* at 10.
[14] The parties agree that the term "legal expenses" as used in this policy definition includes defense costs reasonably and necessarily incurred by Pelnor in defense of Sentilles's suit and Avondale's crossclaim. R. Doc. 330-3 at 4.  They also agree that any attorney's fees, costs, and expenses incurred by Pelnor in pursuing its coverage claim against First State or other insurers and engaging in coverage disputes are not defenses costs and are not any part of "ultimate net loss" under the policy.  *Id.*
[15] R. Doc. 327-4 at 15.
[16] *Id.* at 11, 15.
[17] *Id.* at 11.

3

> Company shall have the right and opportunity to associate with the Insured in the defense and control of any claim or proceedings reasonably likely to involve the Company. In such event the Insured and the Company shall cooperate fully.[18]

Although Pelnor hired counsel and incurred legal expenses, including attorney's fees and court costs, at the inception of its involvement in this lawsuit, Pelnor first tendered notice of the suit to First State on March 16, 2022.[19] First State has not denied coverage or refused to participate in Pelnor's defense on the grounds of late notice.[20] On May 10, 2022, First State wrote to Pelnor stating that it agreed to participate in Pelnor's defense of the lawsuit, subject to a reservation of rights, and to pay an appropriate share of Pelnor's reasonable and necessary post-tender defense costs.[21] On March 28, 2024, Pelnor filed a crossclaim against First State seeking complete indemnity, including all legal expenses incurred in defending against Sentilles's claims, pursuant to the policy.[22]

First State denies any obligation to pay Pelnor's pre-tender defense costs.[23] First State also contends that it is obligated to pay only a pro-rata share of 24.42% of Pelnor's reasonable defense costs incurred between the date of tender (March 16, 2022) and the date Sentilles filed the amended complaint that shortened the alleged period of exposure at Pelnor (March 25, 2024) because First State did not insure Pelnor for the entirety of the exposure period alleged in the original complaint (1974 to 1983).[24] Rather, First State says that it insured Pelnor for only 24.42% of that original period, from 1974 to May 31, 1976.[25] Conversely, First State agrees that it is required to pay the entirety of Pelnor's defense costs incurred after Sentilles filed the amended complaint that changed

---

[18] *Id.* at 16.
[19] R. Doc. 330-3 at 3.
[20] *Id.*
[21] *Id.*
[22] R. Doc. 291 at 23-28.
[23] R. Doc. 330-3 at 3.
[24] *Id.*
[25] *Id.*

4

the exposure period to one (1974 to 1976) more fully encompassed by the policy period (May 31, 1973, to May 31, 1976).[26] Further, in accordance with the policy's "assistance and cooperation" provision, First State associated with Pelnor in the defense and the negotiation of a full and final settlement of Sentilles's claims against First State and Pelnor for a sum authorized, and paid completely, by First State.[27]

## II. PENDING MOTIONS

By way of cross-motions for summary judgment, the parties seek a determination regarding the extent of First State's obligation to pay Pelnor's pre-tender (before March 16, 2022), and post-tender, but pre-amendment (between March 16, 2022, and March 25, 2024), legal expenses.[28]

Pelnor argues that that the insurance policy is an indemnity policy, not a liability policy, meaning that, by the terms of the policy, First State is obligated to indemnify Pelnor, without division, reduction, or set-off, for all of Pelnor's legal expenses, both pre-tender and pre-amendment, because those sums constitute part of the "ultimate net loss" incurred by Pelnor for the singular "occurrence" of Sentilles's occupational disease.[29] Pelnor points out that First State ignores the distinction between liability and indemnity policies and contends that the cases relied upon by First State are inapplicable because they concern liability policies.[30] With respect to the first issue – First State's obligation to pay Pelnor's pre-tender legal expenses – Pelnor urges that the date of tender is irrelevant because the policy does not require tender and First State's responsibility to pay Pelnor's legal expenses does not arise from a duty to defend, but rather from the indemnity obligation as stated in the provisions concerning coverage of personal injury

---

[26] *Id.*
[27] *Id.* at 3-4.
[28] R. Docs. 327; 330.
[29] *See* R. Docs. 327; 374; 392.
[30] R. Docs. 374 at 8, 11-12, 16-18; 392 at 2-9.

liability, the definitions of ultimate net loss and occurrence, and the assistance-and-cooperation clause.[31] Pelnor contends that the policy did not require tender, and indeed, the assistance-and-cooperation clause prohibited it.[32] Pelnor carries the indemnity-versus-liability policy argument on to the second issue – the extent (Pelnor says 100%) of First State's liability for Pelnor's post-tender, pre-amendment legal expenses – and also argues that the policy's definition of "occurrence," as amended by the endorsement that deleted the phrase "during the policy period," obligates First State to cover all of Pelnor's legal expenses that arose prior to Sentilles's filing of the March 25, 2024 amended complaint.[33] To that end, Pelnor argues that "[t]he occurrence is treated as a single insured occurrence that transfers the insured's risk to First State even beyond the policy period as long as the same general conditions (occupational exposure to asbestos) are substantially the same as the conditions that occurred during the policy period."[34] Further, Pelnor contends that, by agreeing that the policy indemnified Pelnor against Sentilles's claim and fully funding the settlement of that claim, First State waived any argument that the indemnification for "legal expenses" is divisible or subject to reduction because such a conclusion would apply "divisibility" to one component of the "ultimate net loss" to be indemnified, *i.e.*, Pelnor's incurred legal expenses, but not another, *i.e.*, Sentilles's personal injury claim.[35] According to Pelnor, First State benefited from Pelnor's defense prior to the filing of the March 25, 2024 amended complaint, and should be required to pay fully for it, especially considering that First State was not prejudiced by Pelnor's so-called late notice.[36] Finally, Pelnor asserts that the allegations in the March 25, 2024 amended complaint that placed the period of exposure completely within the policy period

---

[31] R. Docs. 327-2 at 5-7; 374 at 2-13; 392 at 2-3.
[32] R. Doc. 374 at 10-11.
[33] R. Docs. 327-2 at 7-13; 374 at 2-8, 13-18; 392 at 4-9.
[34] R. Doc. 327-2 at 9.
[35] R. Docs. 327-2 at 13-16; 374 at 18-22; 392 at 9-10.
[36] R. Docs. 327-2 at 13-20; 374 at 19-22; 392 at 5, 9-10.

6

relate back to the filing of the original complaint, meaning that First State cannot rely on the more extended period of exposure alleged in the original complaint to limit its obligation to pay for Pelnor's defense costs.[37]

In contrast, First State argues that, under Louisiana law, it is not required to pay anything toward Pelnor's pre-tender legal expenses, nor is it obligated to pay more than 24.42% of Pelnor's legal expenses incurred between March 16, 2022, and March 25, 2024.[38] First State makes the overarching argument that the insurance policy is a liability policy, not an indemnity policy, because Louisiana's direct action statute applies and First State was obligated to pay when Pelnor incurred legal expenses.[39] As to the first issue – Pelnor's pre-tender legal expenses – First State argues that, under Louisiana law, an insurer is not liable for the insured's pre-tender defense costs and prejudice is irrelevant because First State has not raised late notice as a basis to deny coverage.[40] First State refutes Pelnor's claim that the assistance-and-cooperation clause precluded tender, and instead maintains that First State, for over a year, was precluded from providing the cooperation the clause required due to Pelnor's delayed notice.[41] First State also contends that Pelnor's position that the policy requires First State to pay defense costs as a part of "ultimate net loss," rather than pursuant to a duty to defend, is a "distinction without a difference" for which "Pelnor offers no cogent reason" to ignore the established case law concerning pre-tender legal expenses.[42] On the second issue – Pelnor's post-tender, but pre-amendment legal expenses – First State, citing *Arceneaux v. Amstar Corp.*, 66 So. 3d 438 (La. 2011) ("*Arceneaux I*"), and *Arceneaux v. Amstar Corp.*, 200 So. 3d 277 (La. 2016) ("*Arceneaux II*"), among other cases, argues that

---

[37] R. Docs. 327-2 at 16; 374 at 12-13; 392 at 6-7.
[38] *See* R. Docs. 330; 375; 393.
[39] R. Doc. 393 at 1-7.
[40] R. Docs. 330-1 at 10-12; 375 at 17-19.
[41] R. Doc. 393 at 6-7.
[42] R. Doc. 375 at 17.

7

Louisiana law provides that a liability insurer is only responsible for a pro-rata share of defense costs based upon the percentage of its time-on-the-risk irrespective of whether the amounts incurred are viewed as defense costs or indemnifiable expenses.[43]  Further, First State argues that, contrary to Pelnor's assertion, the policy does include the phrase "during the policy period" in the coverage clause for personal injury liability, making irrelevant the deletion of the phrase from the definition of "occurrence."[44]  First State also contends that the allegations of the amended complaint shortening the exposure period do not relate back to the original complaint as to alter (*i.e.,* expand) the scope of First State's defense obligation and that, in funding the settlement, it did not waive its argument that there should be a pro-rata allocation of defense costs based on its time-on-the-risk.[45]  Specifically, First State argues that it authorized and paid the full amount of the settlement with Sentilles because it was funding 100% of that loss based on the post-amendment time-on-the-risk, but that this analysis does not apply to Pelnor's pre-amendment defense costs.[46]

### III.   LAW & ANALYSIS

#### A. Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  A

---

[43] R. Docs. 330-1 at 12-15; 375 at 5-13.
[44] R. Docs. 375 at 8; 393 at 3.
[45] R. Docs. 330-1 at 13-14; 375 at 14-17; 393 at 8-9.
[46] R. Doc. 375 at 15.

party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *Id*. Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *EEOC v. Simbaki, Ltd*., 767 F.3d 475, 481 (5th Cir. 2014). Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the

nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A), (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

**B. Insurance Policy Interpretation**

The parties do not dispute that Louisiana law governs the interpretation of the insurance policy at issue. Under Louisiana law, an insurance policy, like any other contract, is construed according to the general rules of contract interpretation set forth in the Louisiana Civil Code. *Q Clothier New Orleans, L.L.C. v. Twin City Fire Ins. Co.*, 29 F.4th 252, 256-57 (5th Cir. 2022) (citing *Supreme Servs. & Specialty Co. v. Sonny Greer, Inc.*, 958 So. 2d 634, 638 (La. 2007)). "Courts must first consider the parties' intent by examining the words of the policy." *Id.* at 257 (citing *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 589 (La. 2007); La. Civ. Code arts. 2045-2046). In examining the terms of the policy, "'words and phrases in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning, in which case the words must be ascribed their technical meaning.'" *Id.* (quoting *Sims*, 956 So. 2d at 589).

"'When the words of an insurance contract are clear and unambiguous and lead to no absurd consequences, courts must enforce the contract as written and may make no further interpretation in search of the parties' intent.'" *Id.* (quoting *Gorman v. City of Opelousas*, 148 So. 3d 888, 982 (La. 2014)). A court cannot exercise "inventive powers to create an ambiguity where none exists or [make] a new contract when the terms express with sufficient clearness the parties' intent." *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003). Thus, clear and unambiguous policy wording that expresses the parties' intent is enforced as written. Conversely, ambiguous policy provisions, including "equivocal provisions seeking to narrow an insurer's obligation," are strictly construed against the insurer and in favor of coverage. *Id.* However, the strict-construction principle applies only if the ambiguous policy provision is susceptible of more than one reasonable interpretation. "The determination of whether a contract is clear or ambiguous is a question of law." *Id.*

### C. Analysis

The pending summary-judgment motions ask the Court to determine whether First State is liable for (1) Pelnor's pre-tender defense costs, and (2) more than 24.42% of Pelnor's post-tender, pre-amendment defense costs. The parties make many arguments to support their opposing positions, which can be distilled to a few key points. Essentially, the parties dispute whether the insurance policy provides a duty to defend or a duty to indemnify. On the one hand, if the policy has a duty to defend, First State contends that summary judgment should be granted in its favor because Louisiana law provides that an insurer (a) is not liable for pre-tender defense costs, and (b) in long-latency occupational disease cases, is responsible only for its pro-rata share of attorney's fees based on its time-on-the-risk. On the other hand, if the policy does not include a duty to defend, but rather a duty to indemnify, Pelnor argues that summary judgment should be

11

granted in its favor because the Louisiana case law relied upon by First State, which involves liability insurance policies that include a duty to defend, is not applicable. For the reasons discussed below, the Court finds that the policy contains only a duty to indemnify, not a duty to defend, and thus, First State must pay all of Pelnor's reasonable attorney's fees incurred in defending against Sentilles's claims as part of the ultimate net loss.

The Louisiana supreme court has explained that "an insurer's duty to defend arises whenever the pleadings against the insured disclose a possibility of liability under the policy." *Meloy v. Conoco, Inc.*, 504 So. 2d 833, 839 (La. 1987). However, the terms of the indemnity agreement, not the allegations of the complaint against the indemnitee, govern the indemnitor's obligation to pay, and "a cause of action for indemnification for costs of defense does not arise until the lawsuit is concluded and defense costs are paid." *Id.*

Together, the "ultimate net loss" clause and the "assistance and cooperation" provision clearly and unambiguously indicate that the insurance policy here requires only a duty to indemnify. The "ultimate net loss" clause states that First State must pay for "legal expenses (including attorneys' fees, court costs and interests on any judgment or award)" that Pelnor is required to pay.[47] The parties have stipulated that this phrase includes defense costs reasonably and necessarily incurred by Pelnor in defense of Sentilles's suit and Avondale's crossclaim.[48] The "ultimate net loss" clause must be read in conjunction with the "assistance and cooperation" provision, which states that First State "shall not be called upon to assume charge of the settlement or defense of any claim made or proceedings instituted against [Pelnor]," but rather First State "shall have the right and opportunity to associate with [Pelnor] in the defense and control of any

---

[47] R. Doc. 327-4 at 15.
[48] R. Doc. 330-3 at 4.

claim or proceedings reasonably likely to involve [First State]."[49] With this language, First State disclaimed any duty to defend, although it could choose to participate in the defense. *See San Bernardino Cnty. v. Ins. Co. of Pa.*, 2023 WL 4291835, at *6 (C.D. Cal. May 16, 2023) (holding that these same phrases in an insurance policy constituted a disclaimer of a duty to defend). Moreover, in the absence of a duty to defend, the First State policy plainly includes attorney's fees and other legal expenses – encompassing Pelnor's defense costs – within the definition of "ultimate net loss" for which Pelnor is indemnified. *See Vesta Ins. Co. v. Amoco Prod. Co.*, 986 F.2d 981, 989 (5th Cir. 1993) (holding that an excess insurance policy that lacked a duty-to-defend clause included all litigation costs and expenses in the determination of "ultimate net loss"); *see also Cone Mills Corp. v. Allstate Ins. Co.*, 114 N.C. App. 684, 687-88 (N.C. Ct. App. 1994) (relying on *Vesta* to hold that defense costs were included in the determination of the ultimate net loss for which the excess insurer indemnified the policyholder). Without a duty to defend, the terms of this policy require First State to indemnify Pelnor for the attorney's fees it incurred in defending against Sentilles's claims as a part of the "ultimate net loss."

The same conclusion was reached in *Cash v. UNOCAL Corp.*, 2013 WL 4097143 (W.D. La. Aug. 13, 2013), *rev'd on other grounds*, 624 F. App'x 854 (5th Cir. 2015). In *Cash*, the court examined an excess insurance policy that did not include a duty to defend and required the insurer to indemnify the insured for its covered "ultimate net loss," which included attorney's fees. *Id.* at *6-8. The policy also included an assistance-and-cooperation provision that disclaimed a duty to defend but permitted the insurer to be involved in the litigation. *Id.* at *8. The court ultimately held that, by the terms of the policy, the excess insurer was required to indemnify the insured for its attorney's fees incurred in defense. *Id.* at *9-10.

---

[49] R. Doc. 327-4 at 16.

13

So, because the First State policy is an excess insurance policy that does not include a duty to defend but does require the insurer to indemnify the insured for attorney's fees as part of the "ultimate net loss," the Louisiana insurance law cited by First State in support of its positions is not controlling. First State relies on *Gully & Associates, Inc. v. Wausau Insurance Cos.*, 536 So. 2d 816 (La. App. 1988), to support its argument that it is not liable for Pelnor's pre-tender attorney's fees. *Gully* indeed holds that "the insurer's duty to provide a defense does not arise until the insurer receives notice of the litigation." *Id.* at 818. However, that holding is inapposite here. Because the First State policy does not include a duty to defend, Pelnor had no duty to tender the defense to First State. The insurance policy does require notice though.[50] And Pelnor complied by giving First State notice, but such notice did not constitute a "tender" because it was not required for purposes of triggering any duty to defend on First State's part. That First State decided of its own accord – a choice, not a duty – to pay some of Pelnor's defense costs as they were incurred post-notice does not write a duty to defend into an insurance policy that clear and unambiguously contains none.

Next, First State relies on the *Arceneaux* cases to support its argument that it is liable only for a pro-rata share of Pelnor's post-tender, pre-amendment attorney's fees based on its time-on-the risk. The *Arceneaux* cases involved the interpretation of an insurance policy that included a duty to defend in a long-latency occupational disease context where the insurer was seeking to limit its liability for defense costs based on its time-on-the-risk. *See Arceneaux II*, 200 So. 3d at 279. In *Arceneaux II*, the Louisiana supreme court held "that the duty to defend should be prorated in this case based upon policy language." *Id.* at 279, 286. In so holding, the court noted that "[t]he duty to defend arises solely under contract," and the insurance contract there included such a duty.

---

[50] *Id*.

14

*Id.* at 286. The court reasoned that the policy language limiting coverage for bodily injury to that which occurred during the policy period supported a pro-rata allocation of defense costs in that case. *Id.* It went on to caution that its holding was based on the policy language before it and that this language may not appear in another policy, which then may well require "a different result with regard to responsibility for defense costs." *Id.* Thus, defense-cost allocation must be determined on a case-by-case basis in accordance with "the precise language of the insurance contract at issue." *Id.* As is readily apparent from an examination of the insurance policies at issue, *Arceneaux II* is not applicable here because the First State policy does not include a duty to defend. Instead, First State's liability for Pelnor's legal expenses arises from its obligation to indemnify Pelnor for its "ultimate net loss," which by definition and stipulation, includes those expenses Pelnor incurred in defending against Sentilles's claim and Avondale's crossclaim. Given the policy language in play here, there is no rationale for limiting First State's obligation for the payment of Pelnor's defense costs to those incurred in the post-tender/pre-amendment period based on First State's time-on-the-risk.

In sum, First State is liable for all of Pelnor's attorney's fees and costs incurred in defending against Sentilles's claim and Avondale's crossclaim without division, reduction, or set-off because the insurance policy provides for the indemnification of Pelnor's ultimate net loss, which includes such fees and costs, and the policy contains no duty to defend.

## IV. CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Pelnor's motion for partial summary judgment (R. Doc. 327) is GRANTED.

IT IS FURTHER ORDERED that First State's motion for summary judgment (R. Doc. 330) is DENIED.

New Orleans, Louisiana, this 18th day of January, 2025.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE