UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBERT STEPHEN SENTILLES | CIVIL ACTION |
| VERSUS | NO. 21-958 |
| HUNTINGTON INGALLS INCORPORATED, *et al.* | SECTION M (3) |

**FINDINGS OF FACTS & CONCLUSIONS OF LAW**

This case involves claims for injuries caused by asbestos exposure. But the crossclaim before the Court concerns whether an insurer, defendant-in-crossclaim First State Insurance Company ("First State"), acted in bad faith in failing to pay all of the legal expenses incurred by its insured, plaintiff-in-crossclaim Pelnor, LLC ("Pelnor"), in defending against plaintiff's case. The crossclaim was tried before the Court, sitting without a jury, by the parties' joint presentation of a stipulated record, including stipulated facts, and oral closing arguments. Having considered the evidence admitted at trial, the arguments of counsel, post-trial submissions,[1] and the applicable law, the Court issues its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such, and vice versa.

**FINDINGS OF FACT**

**I.     JURISDICTION**

1.     This Court has diversity subject-matter jurisdiction over the crossclaim under 28 U.S.C. § 1332. The citizenship of crossclaim-plaintiff Pelnor (Louisiana) is completely diverse

---

[1] R. Docs. 501; 502.

from that of crossclaim-defendant First State (Connecticut and Delaware), and the amount in controversy between the parties exceeds $75,000.

2. Venue is appropriate in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims occurred within the district.

**II.    THE PARTIES**

3. Pelnor, which was formerly known as Pellerin Milnor Corporation ("Pellerin"), is a manufacturer of commercial washing machines located in Kenner, Louisiana.[2] Plaintiff Robert Stephen Sentilles worked at Pelnor in the 1970s as a welder, during which time he claims he was exposed to dust from personally handling, and being in the vicinity of others handling, asbestos-containing products.[3]

4. First State is an insurance company that issued an excess umbrella insurance policy to Pellerin for the policy period May 31, 1973, to May 31, 1976.[4] Pelnor currently holds the rights to that policy.[5]

**IV.    THE EXCESS UMBRELLA INSURANCE POLICY – RELEVANT PROVISIONS**

5. The excess umbrella insurance policy at issue has a policy limit of $5,000,000 in excess of the amount recoverable under the underlying insurance or Pelnor's $10,000 retained limit for "[u]ltimate net loss as the result of any one occurrence not covered by said underlying insurance," and there is no underlying insurance.[6]

---

[2] R. Doc. 498 at 1; Statement of Pelnor's counsel at oral argument.
[3] R. Docs. 1-1 at 4; 498 at 1; Tr. Ex. 2 at 4.
[4] R. Docs. 481 at 1, 4; 498 at 2; Tr. Ex. 1.
[5] R. Docs. 481 at 4; 498 at 2.
[6] Tr. Ex. 1 at 1.

6.       The relevant insuring agreements of the policy state:

1. <u>Coverage</u>

> The Company [*i.e.*, First State] agrees to indemnify the insured [*i.e.*, Pelnor] for ultimate net loss in excess of the retained limit hereinafter stated, subject to the limitations, conditions and other terms of this policy, which the insured may sustain by reason of the liability imposed upon the insured by law, or assumed by the Insured under contract on account of:
>
> > (a) Personal Injury Liability
> >
> > For damages and expenses including damages for care and loss of services, to which this insurance applies, because of personal injury, including death resulting therefrom, which occurs during the policy period, sustained by any person or persons, caused by any occurrence[.][7]

7.       The language of the "personal injury liability" clause was amended by endorsement to add the language "which occurs during the policy period."[8]

8.       The policy defines "ultimate net loss" as follows:

> "Ultimate Net Loss" means the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the Insured is liable either by adjudication or compromise with the written consent of the Company, including after making proper deduction for all recoveries and salvages collectible, all loss expenses and legal expenses (including attorneys' fees, court costs and interests on any judgment or award)[9] but excludes all salaries of employees and office expenses of the Insured, the Company or any underlying insurer so insured.[10]

9.       And the term "occurrence," as used in the "personal injury liability" provision, is defined as:

> an accident or event including continuous or repeated exposure to conditions which results, ~~during the policy period~~, in personal injury or property damage neither expected nor intended from the standpoint of the Insured. For the purpose of determining the limit of the Company's liability, all personal injury and property

---

[7] *Id.* at 10, 13.
[8] *Id.* at 10.
[9] The parties agree that the term "legal expenses" as used in this policy definition includes defense costs reasonably and necessarily incurred by Pelnor in defense of Sentilles's suit and Avondale's crossclaim. R. Doc. 481 at 5. They also agree that any attorney's fees, costs, and expenses incurred by Pelnor in pursuing its coverage claim against First State or other insurers and engaging in coverage disputes are not defenses costs and are not any part of "ultimate net loss" under the policy. *Id.* at 5-6.
[10] Tr. Ex. 1 at 15.

3

damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.[11]

10. The definition of "occurrence" was amended by endorsement to remove the phrase "during the policy period," as indicated by the strike-through above.[12]

11. The policy also includes an "assistance and cooperation" clause, which states in pertinent part:

> … the Company shall not be called upon to assume charge of the settlement or defense of any claim made or proceedings instituted against the Insured; but the Company shall have the right and opportunity to associate with the Insured in the defense and control of any claim or proceedings reasonably likely to involve the Company. In such event the Insured and the Company shall cooperate fully.[13]

## IV. PROCEDURAL HISTORY

12. On October 27, 2020, Sentilles was diagnosed with mesothelioma.[14]

13. On May 14, 2021, Sentilles filed this suit in state court asserting negligence and strict liability claims against several defendants, including Pelnor, and alleging that his disease was caused by exposure to asbestos that occurred from the 1950s through the 1980s and after.[15]

14. As to Pelnor, Sentilles alleged in the original complaint that he was exposed to asbestos when he worked at Pelnor from 1974 through 1983.[16]

15. On May 18, 2021, defendant Huntington Ingalls Incorporated ("Avondale") removed the case to this Court.[17]

---

[11] *Id.* at 11, 15.
[12] *Id.* at 11.
[13] *Id.* at 16.
[14] R. Docs. 1-1 at 2; 498 at 1.
[15] R. Docs. 1-1 at 1-16; 498 at 1; Tr. Ex. 2 at 1-16. Plaintiff later amended his complaint to drop any claims for the period after 1983. R. Doc. 56 at 6.
[16] R. Doc. 1-1 at 4; Tr. Ex. 2 at 4. This allegation remained the same in two subsequent amended complaints. *See* R. Docs. 44 at 2; 56 at 6.
[17] R. Doc. 1.

16. Later, on March 25, 2024, Sentilles filed an amended complaint, alleging, for the first time, occupational exposure to asbestos at Pelnor for a shorter period, from 1974 through 1976 (rather than from 1974 through 1983).[18]

17. Although Pelnor hired counsel and incurred legal expenses, including attorney's fees and court costs, at the inception of its involvement in this lawsuit, Pelnor first tendered notice of the suit to First State on March 16, 2022.[19]

18. First State has not denied coverage or refused to participate in Pelnor's defense on the grounds of late notice.[20]

19. On May 10, 2022, First State wrote to Pelnor stating that it agreed to participate in Pelnor's defense of the lawsuit, subject to a reservation of rights, and to pay an appropriate share of Pelnor's reasonable and necessary post-tender defense costs.[21]

20. On March 28, 2024, Pelnor filed a crossclaim against First State seeking complete indemnity, including all legal expenses incurred in defending against Sentilles's claims, pursuant to the policy.[22]

21. Pursuant to the policy's "assistance and cooperation" clause, First State associated with Pelnor in the defense and control of the claim and proceeding and cooperated fully, even to the point of negotiating a full and final settlement of Sentilles's claims against the companies for an amount authorized by First State.[23]

22. Thus, on September 5, 2024, Sentilles reached a settlement with Pelnor and First State for all claims that he asserted against the companies.[24]

---

[18] R. Docs. 289 at 6; 498 at 3; Tr. Ex. 5 at 6.
[19] R. Docs. 481 at 4; 498 at 2.
[20] R. Doc. 481 at 5.
[21] R. Docs. 481 at 5; 498 at 2; Tr. Ex. 3.
[22] R. Doc. 291 at 23-28.
[23] R. Doc. 498 at 3.
[24] *Id.*

23. First State paid 100% of the settlement amount as an indemnified "ultimate net loss" as defined by the policy.[25]

24. After they settled with Sentilles, Pelnor and First State filed cross-motions for summary judgment to determine the extent of First State's obligation to pay Pelnor's pre-notice (before March 16, 2022), and post-notice, but pre-amendment (between March 16, 2022 and March 25, 2024), legal expenses.[26] Each party responded in opposition to the other's motion,[27] and replied in further support of its own motion.[28]

25. Pelnor argued that the insurance policy is an indemnity policy, not a liability policy, meaning that, by the terms of the policy, First State is obligated to indemnify Pelnor, without division, reduction, or set-off, for all of Pelnor's legal expenses, both pre-notice and pre-amendment, because those sums constitute part of the "ultimate net loss" incurred by Pelnor for the single "occurrence" of Sentilles's occupational disease.[29]

26. First State denied any obligation to pay Pelnor's pre-tender defense costs.[30] First State also contended that it is obligated to pay only a pro-rata share of 24.42% of Pelnor's reasonable defense costs incurred between the date of tender (March 16, 2022) and the date Sentilles filed the amended complaint that shortened the alleged period of exposure at Pelnor (March 25, 2024) because First State did not insure Pelnor for the entirety of the exposure period

---

[25] *Id.*
[26] R. Docs. 327 (Pelnor's summary-judgment motion); 330 (First State's summary-judgment motion); 498 at 4; Tr. Exs. 6; 8.
[27] R. Docs. 374 (Pelnor's opposition); 375 (First State's opposition); Tr. Exs. 7; 9.
[28] R. Docs. 392 (Pelnor's reply); 393 (First State's reply); Tr. Exs. 6; 8.
[29] *See* R. Docs. 327; 374; 392; 498 at 3-4; Tr. Exs. 7; 8.
[30] R. Docs. 330-3 at 3; 481 at 5; 498 at 3-4; Tr. Ex. 6 at 5.

alleged in the original complaint (1974 to 1983).[31] Rather, First State said that it insured Pelnor for only 24.42% of that original period, from 1974 to May 31, 1976.[32]

27.   On January 20, 2025, this Court issued an Order & Reasons on the parties' cross-motions for summary judgment granting Pelnor's motion and denying First State's motion.[33]

28.   The Court held that taken "[t]ogether, the 'ultimate net loss' clause and the 'assistance and cooperation' provision clearly and unambiguously indicate that the insurance policy requires only a duty to indemnify," and not a duty to defend.[34]

29.   Because the policy does not include a duty to defend, the cases cited by First State, which all involved such a duty, were inapplicable.[35]

30.   Thus, the Court concluded that "First State is liable for all of Pelnor's attorney's fees and costs incurred in defending against Sentilles's claim and Avondale's crossclaim without division, reduction, or set-off because the insurance policy provides for the indemnification of Pelnor's ultimate net loss, which includes such fees and costs, and the policy contains no duty to defend."[36]

31.   The pre-notice "legal expenses" submitted by Pelnor to First State that are unpaid and disputed by First State are in the amount of $236,000.[37]

32.   The post notice and pre-amendment "legal expenses" submitted by Pelnor to First State that are unpaid and disputed by First State are in the amount of $112,000.[38]

---

[31] R. Doc. 330-3 at 3; 481 at 5; 498 at 4; Tr. Ex. 6 at 5.
[32] R. Doc. 330-3 at 3; 481 at 5; 498 at 4; Tr. Ex. 6 at 5. First State agreed that it is required to pay the entirety of Pelnor's defense costs incurred after Sentilles filed the amended complaint that changed the exposure period to one (1974 to 1976) more fully encompassed by the policy period (May 31, 1973, to May 31, 1976). R. Doc. 330-3 at 3; Tr. Ex. 6 at 5. First State has paid those amounts. R. Doc. 481 at 2, 4.
[33] R. Doc. 399; Tr. Ex. 10.
[34] R. Doc. 399 at 12; Tr. Ex. 10 at 12.
[35] R. Doc. 399 at 15; Tr. Ex. 10 at 15.
[36] R. Doc. 399 at 15; Tr. Ex. 10 at 15.
[37] R. Doc. 498 at 5.
[38] *Id.*

33. There is no dispute that First State paid 24.42% of the post-notice /pre-amendment "legal expenses."[39]

34. The total amount in dispute is $348,000.[40]

35. The parties stipulated that the "loss expenses and legal expenses" incurred and paid by Pelnor in the amount of $348,000 were reasonable and necessary in Pelnor's defense, legal representation, and risk management of Pelnor's potential liability arising from the claims asserted by Sentilles against Pelnor in this civil action. First State does not dispute the amount, only that it is responsible for this amount.[41]

36. Defense costs are included in Pelnor's "retained limit" under the policy.[42]

37. First State had documentation of the unpaid legal expenses incurred by Pelnor on or before January 20, 2025.[43]

38. Since January 20, 2025, First State has not paid or tendered to Pelnor any of the disputed legal expenses that were subject to the Court's summary-judgment ruling issued on that date.[44]

39. From January 20, 2025, through August 31, 2025, Pelnor has incurred $21,176.00 in attorney's fees and legal expenses in litigation arising from the prosecution of Pelnor's crossclaim against First State.[45]

40. On April 17, 2025, with leave of Court, Pelnor filed a supplemental and amending crossclaim against First State asserting a bad-faith claim under La. R.S. 22:1892.[46]

---

[39] *Id.*
[40] *Id.*
[41] *Id.* at 6.
[42] *Id.*
[43] *Id.*
[44] R. Docs. 481 at 6; R. Doc. 498 at 5.
[45] R. Doc. 498 at 5.
[46] R. Doc. 470.

8

41. First State contends that it is not in bad faith for failing to pay the disputed amounts because this Court's January 20, 2025 Order & Reasons is interlocutory, not final, and First State continues to assert in good faith its reasonable position regarding the defense cost dispute.[47]

## CONCLUSIONS OF LAW

I. **RECONSIDERATION OF THE JANUARY 20, 2025 ORDER & REASONS**

1. First State seeks reconsideration of this Court's January 20, 2025 Order & Reasons under Rule 54(b) of the Federal Rules of Civil Procedure, arguing that it did not base its arguments at summary judgment on a duty to defend and that the cases it cited, although they involved a duty to defend, did not make a distinction between a duty to defend and an obligation to indemnify the insured for defense costs. As such, says First State, the Court should apply those cases here to find that First State is not liable for pre-notice defense costs and is only liable for its pro-rata percentage of time-on-the-risk, or 24.42%, of the post-notice, pre-amendment defense costs.[48]

2. Under Rule 54(b), a "court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (quotation omitted). Rule 54(b) "'reflect[s] the inherent power of the rendering district court to afford such relief from interlocutory judgments as justice requires.'" *Id.* at 337 (quoting *Cobell v. Jewell*, 802 F.3d 12, 25 (D.C. Cir. 2015)) (internal quotation marks omitted). However, the district court must exercise this broad discretion sparingly to forestall the perpetual reexamination of orders and the resulting burdens and delays. *See Calpecto 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1415 (5th Cir. 1993) (observing that if "the district court was required to reconsider [an interlocutory order] simply because [the losing party] belatedly came forward with evidence not

---

[47] R. Doc. 481 at 4.
[48] R. Doc. 497 at 1-3.

9

submitted prior to the ruling[,] ... the cycle of reconsideration would be never-ending"); *Domain Prot., LLC v. Sea Wasp, LLC*, 2019 WL 3933614, at *5 (E.D. Tex. Aug. 20, 2019) ("although a district court may revisit an interlocutory order on any ground it sees fit, it may also use its discretion to prevent parties from, without justification, raising new arguments for the first time") (emphasis, alterations, and quotation omitted); 18B CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478.1 (3d ed. 2019) ("A trial court could not operate if it were to yield to every request to reconsider each of the multitude of rulings that may be made between filing and final judgment.").

3.  First State's motion to reconsider is denied. In ruling on the cross-motions for summary judgment, this Court carefully considered the policy language in light of the applicable case law to reach the conclusion that First State is liable for all of Pelnor's defense costs as part of the ultimate net loss, as defined by the policy. The Court is not persuaded by First State's arguments seeking to extend the duty-to-defend case law to an indemnity policy. However, the Court does note that it believes First State is making its argument in good faith.

**II.      BAD FAITH UNDER LA. R.S. 22:1892**

4.  Section 22:1892(A)(1) of the Louisiana Revised Statutes provides that an insurer "shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured …." An insurer's failure to do so that "is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, plus any proven economic damages sustained as a result of the breach, or one thousand dollars, whichever is greater, payable to the insured, or in the event that a partial payment or tender has been made, fifty percent of the difference between the amount paid or tendered and the amount

found to be due, plus any proven economic damages sustained as a result of the breach, as well as, in either instance, reasonable attorney fees and costs." La. R.S. 22:1892(B)(1)(a).

5. Statutes such as La. R.S. 22:1892 that subject "insurers to penalties are considered penal in nature and should be strictly construed." *Bridges v. Chubb Indem. Ins. Co.*, --- So. 3d --- 2025 WL 1822937, at *11 (La. App. July 2, 2025) (citation omitted).

6. "[T]he party seeking to recover a penalty under La. R.S. 22:1892(B)(1)(a), b[ears] the burden of proving that the [insurer] failed to timely pay [the amount] owed … under § 1892(A)(2) and that the delay was arbitrary, capricious, or without probable cause." *Id.* at *6.

7. "A party seeking relief under [§ 1892] has the burden of establishing three things: (1) the insurer received a satisfactory proof of loss; (2) the insurer failed to pay the claim within the applicable statutory period (thirty … days); and (3) the insurer's failure to pay the claim was arbitrary and capricious." *XL Specialty Ins. Co. v. Bollinger Shipyards, Inc.*, 954 F. Supp. 2d 440, 444 (E.D. La. 2013) (citing *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 297 (5th Cir. 2009)). Here, the only question is whether First State's failure to pay the outstanding attorney's fees and costs within thirty days after January 20, 2025 (the date this Court issued its Order & Reasons holding that First State is liable for all of Pelnor's attorney's fees and costs incurred in defending against Sentilles's claim and Avondale's crossclaim), was "arbitrary and capricious" or "without probable cause."

8. "The sanctions of penalties and attorney fees are not assessed unless a plaintiff's proof is clear that the insurer was in fact arbitrary, capricious, or without probable cause in refusing to pay." *Reed v. State Farm Mut. Auto. Ins. Co.*, 857 So. 2d 1012, 1021 (La. 2003). The Louisiana supreme court has stated that the phrase "arbitrary, capricious, or without probable cause" "is synonymous with 'vexatious,'" and a "'vexatious refusal to pay' means unjustified, without

11

reasonable or probable cause or excuse." *Id.* "Both phrases describe an insurer whose willful refusal of a claim is not based on a good-faith defense." *Id.* Accordingly, "[t]he statutory penalties are inappropriate when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense." *Id.* Indeed, "[t]he statute is not intended … to prevent insurers from disputing claims in good faith, including litigating such disputes." *Dickerson*, 556 F.3d at 299 (collecting Louisiana supreme court cases).

9. First State's refusal to pay the outstanding amounts for attorney's fees and costs – even after the issuance of this Court's January 20, 2025 Order & Reasons – is not arbitrary, capricious, or without probable cause. Although this Court disagreed with First State's interpretation of how the case law applies to the policy language and held that First State is liable for all of Pelnor's attorney's fees, First State continues to assert its position on the law at this stage with a request for reconsideration of this Court's January 20, 2025 Order & Reasons, and says it will do so through appeal, all in good faith. First State should not be subject to penalties for exercising its rights to seek review of this Court's ruling, when it has not presented frivolous arguments, such as those clearly foreclosed by controlling legal authority. *See Lacoste Aviation, LLC v. StarStone Nat'l Ins. Co.*, 719 F. Supp. 3d 502, 513 (E.D. La. 2024) (holding that an insurer did not act vexatiously when it presented nonfrivolous, good-faith arguments regarding its interpretation of the policy because "[i]t would be overly expansive to find that a penalty statute, which is to be construed in a severely limited manner, applies each time that an insurer disputes coverage of a claim based on a misinterpretation" of the policy); *see also Howell v. Am. Cas. Co. of Reading, Pa.*, 691 So. 2d 715, 727 (La. App. 1997) (finding that an insurer was not subject to bad-faith penalties, even though its position turned out to be wrong after appeal, when it "presented

12

good faith, reasonable arguments" on its coverage defense and "[n]o party … pointed out any legal authority which show[ed the insurer]'s coverage defense to have been frivolous).

### III.  MISREPRESENTATION OF POLICY PROVISIONS

10. The Louisiana penalty statute provides that "[a]n insurer, including but not limited to a foreign line or surplus line insurer, owes to its insured a duty of good faith and fair dealing." La. R.S. 22:1892(I)(1)(a). This includes "an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured …." *Id.* If an insurer breaches these duties with respect to claims not involving loss to an insured's immovable property, the insurer is liable for the greater of $5,000 or 50% of any proven economic damages sustained as a result of the breaches. *Id.* "Any penalty for breach of a duty imposed by [§ 1892(I)(1)(a)] based solely upon a failure to pay the amount of any claim due to any person insured by the contract within the period provided by law following receipt of satisfactory proof of loss shall be awarded only if the breach is found to be arbitrary, capricious, or without probable cause." *Id.* An insurer breaches its duties if it (or its representative) knowingly misrepresents "pertinent facts or insurance policy provisions relating to any coverages at issue." La. R.S. 22:1892(I)(2)(a).

11. "A misrepresentation can occur when an insurer either makes untrue statements to an insured concerning pertinent policy provisions or fails to divulge pertinent facts to the insured." *Transamerica Life Ins. Co. v. Fuselier*, 378 So. 3d 145, 156 (La. App. 2023).

12. Pelnor has not proved that First State misrepresented a policy provision to Pelnor. Instead, Pelnor asserts that First State failed to cite all pertinent policy provisions to the Court in the summary-judgment filings. Even if true, there is nothing in the record that shows that First State made "an affirmative misrepresentation or with[eld] pertinent facts from [Pelnor]." *Lacoste*

13

*Aviation*, 719 F. Supp. 3d at 513. Accordingly, First State is not subject to penalties under La. R.S. 22:1892(I).

### IV. DAMAGES

13. The parties have stipulated that the total amount in dispute is $348,000, representing unpaid pre-notice legal expenses in the amount of $236,000 and post-notice, pre-amendment legal expenses in the amount of $112,000.[49]

14. The total amount in dispute must be reduced by the $10,000 retained limit of the policy.[50]

15. Thus, Pelnor is awarded $338,000.

### CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that there be judgment in favor of Pelnor on its breach-of-contract claim against First State, for which Pelnor is awarded $338,000.

IT IS FURTHER ORDERED that there be judgment in favor of First State on Pelnor's bad-faith claims, and those claims are DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this 24th day of October, 2025.

*[signature]*
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE

---

[49] R. Doc. 498 at 5.
[50] Tr. Ex. 1 at 1.